IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DESIREE MILLER, Individually and as Parent and Natural Guardian of M.C. a minor,** | : | **Civil No. 22-CV-00958** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **VIOLET SCHMID, Individually and as Trustee of The Gerald and Violet Schmid Trust** | : | **Judge Sylvia H. Rambo** |
| | : | |
| **and** | : | |
| | : | |
| **GERALD SCHMID, Individually and as Trustee of The Gerald and Violet Schmid Trust** | : | |
| | : | |
| **Defendants.** | : | |

# M E M O R A N D U M

In this civil action invoking the court's diversity jurisdiction under 28 U.S.C. § 1332, Plaintiff brings eight common law tort claims pursuant to Pennsylvania law against Defendants in connection with a landlord-tenant dispute. Presently before the court is a motion for summary judgment filed by Defendants. (Doc. 33.) For the reasons set forth below, the motion will be granted in part and denied in part.

## I.   BACKGROUND

This matter arises out of a landlord-tenant dispute between Plaintiff Desiree Miller ("Desiree") and Defendants Violet and Gerald Schmid ("Violet" and

"Gerald," or the "Schmids") that occurred in the summer of 2020 involving an apartment located at 228 East Main Street, Waynesboro, Pennsylvania ("the apartment"). (Doc. 34 ¶ 1.)

On October 30, 2018, Plaintiff entered into a one-year lease agreement with Lori and Barry Penrod to rent the second-floor apartment. (*Id.* ¶ 2.) Under the terms of the lease, Desiree paid the Penrods monthly rent of $900 in advance on the first calendar day of each month. (*Id.* ¶ 3.) Nonpayment of rent was cause for eviction under applicable state law, and Desiree agreed to waive the typical thirty-day notice period prior to filing eviction proceedings. (Doc. 34 ¶ 6; Doc. 39 ¶ 6.)

After signing the lease, Desiree moved into the apartment with her two children, including her minor son, M.C. (*Id.* ¶ 7.) When the lease expired in November 2019, Desiree and the Penrods orally agreed that she could continue renting the apartment under the same conditions set forth in the lease on a month-to-month basis. (*Id.* ¶ 8.)

 Desiree did not pay rent for April, May, or June of 2020, which she testified was at the oral direction of Barry Penrod due to the then-ongoing COVID-19 pandemic. (*Id.* ¶¶ 9-10; Doc. 39 ¶¶ 9-10.)

On June 16, 2020, Violet contacted Desiree and indicated that she and her husband were taking ownership of the apartment from the Penrods and asked to inspect the apartment for necessary repairs. (Doc. 34 ¶ 11.) Desiree agreed via text

message that they could come to the apartment on June 21, 2020. (*Id.* ¶ 12.) In the interim, Desiree attempted to confirm that the Schmids owned the property with the local Recorder of Deeds and Tax Office, both of which indicated that the Schmids did not own the property. (Doc. 39 ¶ 12.) Plaintiff then contacted the Waynesboro Police Department, who informed her not to let the Schmids onto the property and to discontinue her conversation with Violet. (*Id.* ¶ 13.)

On June 21, 2020, at 10:26AM, Violet sent Desiree a text message reminding her that she and her husband would arrive between 12:00 and 1:00PM to inspect the premises. (*Id.* ¶ 14.) According to Desiree's boyfriend, Daniel McClung, the Schmids arrived at the apartment and knocked on the door for fifteen to twenty minutes before he answered it. (Doc. 34 ¶¶ 15-16; Doc. 39 ¶ 15.) He denied them entry into the apartment but testified that Violet prevented him from closing the door. (Doc. 34 ¶ 16; Doc. 39 ¶ 16.) The parties dispute whether Violet then physically entered the apartment. (Doc. 34 ¶ 18; Doc. 39 ¶ 18.) During the exchange, Plaintiff was in the master bedroom and M.C. was in the kitchen area. (Doc. 34 ¶¶ 16-17; Doc. 39 ¶¶ 16-17.)

On June 23, 2020, the Schmids executed a deed in lieu of foreclosure for the apartment, granting them full ownership of the property. (Doc. 34 ¶ 19.) On June 24, 2020, Violet sent Desiree a text message indicating she had the paperwork to prove ownership of the premises and requesting a time the next day to inspect the

apartment. (*Id.* ¶¶ 19-20.) Desiree did not respond. (*Id.* ¶ 21.) Instead, Desiree's attorney, Jason Piatt, contacted Violet and later her attorney to inform them that he represented Desiree, that the Schmids should not directly contact her, that entry to the apartment on June 25, 2020, could not be arranged, and that they should not attempt entry at any time without first providing written notice to him. (Doc. 39 ¶¶ 22-23.)

On July 3, 2020, Violet sent a text message to Desiree advising her that she and a realtor, Lisa Stockslager, planned to inspect the apartment on July 6, 2020. (Doc. 34 ¶ 24.) Mr. Piatt again instructed the Schmids not to contact Desiree directly and further informed them that July 6th would not work. (Doc. 34 ¶ 25; Doc. 39 ¶ 25.) Violet responded by text to both Desiree and Mr. Piatt, stating that Desiree was behind on rent and, further, that "delaying us and keeping us out of our property, instead of working with us, the owners, is only going to make this worse for her." (Doc 34 ¶ 25; Doc. 39 ¶ 25.) Desiree interpreted this message as a threat. (Doc. 34 ¶ 27.)

On July 4, 2020, Desiree, her boyfriend, and M.C. went to a Fourth of July party at a friend's house. (Doc 34 ¶ 28; Doc. 39 ¶ 28.) At the party, Desiree received a text message from the mother of M.C.'s ex-girlfriend stating that M.C. had texted the ex-girlfriend indicating he was going to commit suicide. (Doc 34 ¶ 29; Doc. 39 ¶ 29.) Desiree found M.C. in the basement of the friend's home looking for a gun

safe. (Doc. 34 ¶ 30.) He was taken to Waynesboro Hospital and then admitted to Roxbury, a local psychiatric hospital, on July 5, 2020.[1] (Doc 34 ¶ 35; Doc. 39 ¶ 35.) When asked about these events, M.C. testified that he wanted to commit suicide because he was sad that he was "being taken from his mom" or may be "homeless." (Doc 34 ¶ 32; Doc. 39 ¶ 32.) However, he also stated that he never heard his mother talk about the Schmids or express concern that he would be taken away or that they would be homeless, but only that he overheard her talk about the need to move. (Doc 34 ¶¶ 33-34; Doc. 39 ¶¶ 33-34.) (M.C. Dep., pp 13-15.)

On July 6, 2020, Desiree observed a Notice to Quit posted on her front door advising that they had ten days to vacate the premises for failure to pay rent. (*Id.* ¶ 37.) She immediately began looking for a new residence for her family and by July 9, 2020, she had executed a lease for a new rental home. (Doc. 34 ¶¶ 36, 39.) On July 10, 2020, she rented a U-Haul and moved some of their items out of the apartment. (Doc. 34 ¶¶ 38-39.) Additional items, however, remained in the apartment, which Desiree testified included important documents, fragile items, fishing gear, furniture, clothing, and "intimate" items. (Doc. 34 ¶¶ 38, 40, 43; Doc. 39 ¶ 38, 40.) After July 10, 2020, Desiree and her family did not stay in the apartment

---

[1] Plaintiff and M.C. were later evaluated by Dr. Matt Schollenberger, Ph.D, who did not not causally link M.C.'s suicide attempt to the subject events and did not offer an opinion as to whether Plaintiff or M.C. suffer from any physical symptoms of emotional distress. (Doc. 34 ¶¶ 67-69.)

again and Desiree did not advise the Schmids that they had moved out. (Doc. 34 ¶¶ 42, 44; Doc. 39 ¶ 42.)

On or about July 20, 2020, the tenant in the unit below Desiree's apartment alerted the Schmids to a water leak coming from above. (Doc. 34 ¶ 45.) The same day, the Schmids entered the apartment to investigate the leak. (Doc. 34 ¶ 46.) After they left the apartment, Desiree returned to retrieve additional items and noticed that it appeared someone had been in the apartment. (Doc. 34 ¶ 47; Doc. 39 ¶ 47.) She called the Waynesboro Police, who then arrived to investigate and advised Desiree that the Schmids had entered the apartment in response to an emergency. (Doc. 34. ¶¶ 48-49, 51; Doc. 39 ¶ 51.) Desiree collected some of her remaining belongings and left the apartment. (Doc. 34 ¶ 50.)

On July 21, 2020, the Schmids' attorney, Jeffrey Evans, emailed Mr. Piatt to advise him that it appeared Desiree had relocated but left personal property behind at the apartment and that Desiree could retrieve her belongings with notice to his clients. (Doc. 34 ¶¶ 52-53.) Several days later, Mr. Evans wrote again, stating that the Schmids would hold Desiree's belongings until August 15, 2020, that she could retrieve her belongings with notice to him, that the apartment locks had been changed, and that Desiree would be charged with trespassing if she entered the apartment without permission. (Doc. 34 ¶ 54; Doc. 39 ¶ 54.)

Over the next ten days, the attorneys exchanged correspondence to arrange a time for Desiree to collect her belongings. (Doc. 34 ¶ 54.) During this time, however, the Schmids began renovations in the apartment and hired certain individuals, including the Hippensteel brothers,[2] to move the remaining items into an unoccupied unit on the first floor. (Doc. 39 ¶ 55.) The parties ultimately agreed that Desiree could retrieve her belongings on August 5, 2020, but when she went to pick up the items, she testified that some of the items were missing, damaged, destroyed, or not suitable to take because they were mixed with garbage. (Doc. 34 ¶¶ 56-59; Doc. 39 ¶¶ 56-59.)

Mr. Evans subsequently contacted Mr. Piatt to inquire whether Plaintiff intended to collect the items left behind or if they could be discarded. (Doc. 34 ¶ 60.) Mr. Piatt responded that the remaining belongings were mixed with garbage and that Desiree "will not be taking any of that." (Doc. 39 ¶ 61.) The parties dispute the value of the property that Desiree alleges was missing, damaged, or destroyed. (Doc. 34 ¶¶ 62-64; Doc. 39 ¶¶ 62-64.)

In June 2022, Plaintiff initiated this action on behalf of herself and M.C. against Defendants by filing a complaint, which she subsequently amended in September 2022. (Doc. 1; Doc. 8.) Count I of the amended complaint asserts claims

---

[2] Plaintiff never observed the Hippensteel brothers remove or damage her property, and neither brother has been arrested or charged with a crime related to the events of this case, though Plaintiff alleges they are known to the Waynesboro Police Department. (Doc. 34 ¶¶ 65-66; Doc. 39 ¶ 66.)

of trespass against Defendants. Count II asserts intentional infliction of emotional distress ("IIED"). Count III asserts negligent infliction of emotional distress ("NIED"). Count IV asserts trespass to chattels. Count V asserts conversion. Count VI asserts civil conspiracy. Count VII asserts negligent hiring and supervision. Count VIII asserts aiding and abetting against Defendant Gerald Schmid only. Plaintiff additionally requests punitive damages for each claim. Jurisdiction is proper under 28 U.S.C. § 1332 and all claims will be evaluated under Pennsylvania law as this court sits in diversity.

Defendants have filed a motion requesting summary judgment on all counts. (Doc. 33.) The motion has been fully briefed and is ripe for review.

## II.   <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(a) provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law and is "genuine" only if there is a sufficient evidentiary basis for a reasonable factfinder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and

draw all reasonable inferences in their favor. *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

### III.   **DISCUSSION**

#### A. Trespass

Under Pennsylvania law, a trespass occurs when a person who is not privileged to do so enters land in possession of another, whether willfully or by mistake. *Briggs v. Southwestern Energy Prod. Co.*, 224 A.3d 334, 346 (Pa. 2020) (citing *Kopka v. Bell Tel. Co. of Pa.*, 91 A.2d 232, 235 (1952). "If the actor is and intends to be upon the particular piece of land in question, it is immaterial that he honestly and reasonably believes that he has the consent of the lawful possessor to enter, or, indeed, that he himself is its possessor." Restatement (Second) of Torts § 164, cmt. a (Am. L. Inst. 1965)

#### 1.  **June 21, 2020**

Viewing the facts in the light most favorable to the non-moving party, Plaintiff has raised a genuine issue of material fact as to whether Defendant Violet Schmid trespassed into the apartment on June 21, 2020. Defendants argue that on June 21, 2020, they "never physically entered [the apartment] and left once they were denied entry." (Doc. 35, pp. 23.) Plaintiff's boyfriend Daniel McClung, however, testified that, "I didn't know what [Violet] was doing. I thought she was coming at me. So I was leaning back trying to shut the door, and she came in like that." (McClung Dep.,

pp. 28.) He further testified that Violet's arm, hand, and foot were in the apartment.[3] (Doc. 40 pp. 11; Doc. 39 ¶ 18.) Summary judgment is thus inappropriate on this initial claim because there is a genuine dispute as to whether Violet trespassed into the apartment. There are no facts in the record, however, to support that Defendant Gerald Schmid trespassed into the apartment on this date and, therefore, summary judgement is appropriate with respect to him.

### 2. July 20, 2020, and After

Defendants assert that they are entitled to summary judgment as to the latter entries into the apartment because Plaintiff moved out on July 10, 2020, pursuant to an eviction notice for failure to pay rent, and Defendants did not enter the apartment until July 20, 2020, and even so, they only entered to investigate a water leak thereby privileging their entrance. (Doc. 35, pp. 7-8.) Plaintiff insists that the leak was a pretext for Defendants to enter the apartment and effectuate a self-help eviction in contravention of Pennsylvania law.[4] (Doc. 40, pp. 11.) She points to the lack of evidence of a leak and the coincidence of a leak only days after Defendants

---

[3]Q:    Other than her hand being on the door and her foot perhaps crossing the threshold, was any other part of her body in the house – excuse me, in the apartment?

A:    No, just her arm, hand, and foot.

[4] Plaintiff cites to 68 P.S. § 398.10.1 for the proposition that Pennsylvania law requires a landlord to seek a determination of abandonment from a magisterial district court or written statement from the tenant that a property has been abandoned. This provision, however, applies only to manufactured homes and nothing in the record indicates that the property was a manufactured home.

demanded she leave. Further, she argues that the items left in the apartment, which Defendants' agents moved, were expensive and of sentimental value. (Doc. 40, pp. 17.)

Because the parties dispute whether Plaintiff had, in fact, abandoned the apartment at the time of Defendants' and/or their agents' July 20, 2020, entry and subsequent entries, and as to whether those entries were permitted or privileged due to an emergency and/or proper eviction,[5] the court is constrained to find that summary judgment is not warranted as to these alleged trespasses.

### B.    Intentional Infliction of Emotional Distress

To prove a claim for intentional infliction of emotional distress, a plaintiff must establish that the defendant's conduct: (1) was intentional or reckless; (2) was extreme and outrageous; (3) actually caused the distress; and (4) caused distress that was severe. *Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999) (citations omitted). To establish "outrageous conduct" in Pennsylvania, "it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Hoy v. Angelone*, 720 A.2d 745, 754

---

[5] As is evident from the parties' statements of material facts, Plaintiff contends that rent was waived by Barry Penrod during the early months of the pandemic, non-payment of which is the basis for Defendants' subsequent eviction of Plaintiff. Whether rent was waived bears on whether Defendants could evict Plaintiff under Pennsylvania law.

(Pa. 1998) (quoting Restatement (Second) of Torts § 46, cmt. d (1977)); *Daughen v. Fox*, 539 A.2d 858, 861 (Pa. Super. Ct. 1988); *Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1183 (Pa. Super. Ct. 1989). Instead, the conduct must be "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized society." *Mulgrew v. Sears Roebuck & Co.*, 868 F. Supp. 98, 103 (E.D. Pa. 1994). Due to the subjective nature of what constitutes outrageous conduct, the availability of recovery for intentional infliction of emotional distress is "highly circumscribed." *Gray v. Huntzinger*, 147 A.3d 924, 927-28 (Pa. Super. Ct. 2016) (quoting *Kazatkzy v. King David Memorial Park, Inc.*, 527 A.2d 988 (Pa. 1981)). Moreover, objective proof of an injury is required. *Gray*, 147 A.3d at 928.

Defendants assert that their actions were justified because they were exercising their rights as landlords to inspect the apartment, collect rent, and when that failed, evict Plaintiff and her family. (Doc. 35, pp. 10-11.) Plaintiff responds that Defendants' conduct was outside the bounds of reasonableness and caused M.C. to attempt suicide. (Doc. 40, pp. 12.) However, Plaintiff's argument is heavy on rhetoric and light on facts. Here, based on the record, and even resolving all inferences in favor of Plaintiff, no fact finder could reasonably conclude that Defendants' conduct was "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized

society." *Mulgrew*, 868 F. Supp. at 103. Neither could a reasonable fact finder conclude that the actions of Defendants, whether tortious or not, caused a physical injury to Plaintiff or M.C. As such, summary judgment is appropriate in Defendant's favor on the IIED claim.

### C. Negligent Infliction of Emotional Distress

Defendants similarly prevail on their summary judgment motion involving Plaintiff's NIED claim for lack of physical injury or causation. (Doc. 35, pp. 12.) Without citing to the record, Plaintiff asserts that Defendants' conduct was the cause-in-fact and proximate cause of M.C.'s suicide attempt and that Plaintiff suffered severe emotional injury by witnessing M.C.'s self-harming behavior. (Doc. 40, pp. 15.)

To state a claim for NIED in Pennsylvania, a plaintiff must first establish a prima facie case of negligence, i.e., duty, breach, causation, and damages. *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 469 (M.D. Pa. 2022) A plaintiff must then establish that they "either (1) suffered a physical injury that caused the emotional distress; (2) suffered no injury, but experienced emotional distress from having been in the 'zone of danger'; (3) witnessed an accident that seriously injured a close family member; or, under the most, and perhaps an overly, expansive reading of current Pennsylvania law, (4) had a special relationship with the defendant that included in it an implied duty to care for their emotional well-being." *Id.*

A plaintiff asserting a special relationship NIED cause of action absent physical injury, as Plaintiff appears to assert here, must demonstrate "the genuineness of the alleged emotional distress, in part, by proving the element of causation." *Toney v. Chester County Hosp.*, 36 A.3d 83, 99 (Pa. 2011). Further, "[u]nlike cases involving a physical impact, a plaintiff in a non-impact case faces a more difficult task of convincing a court of the legitimacy of the emotional distress and the causal nexus between the negligent action at issue and alleged distress." *Id.*

Here, neither Plaintiff nor M.C. sustained physical injuries, instead relying only on conclusory allegations that Defendants were the but-for and proximate cause of M.C.'s attempted self-harm and Desiree's emotional distress. (Doc. 40, pp. 15.). (Doc. 35, pp. 12.) This is not enough at the summary judgment stage.

### D. Trespass to Chattels and Conversion

Defendants also move for summary judgment on Plaintiff's trespass to chattels and conversion claims. The court addresses these claims together because the elements "are essentially the same" under Pennsylvania law. *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 600 (E.D. Pa. 2016).

"A trespass to a chattel may be committed by intentionally: (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *QVC*, 159 F. Supp. 3d at 600 (citing *Pestco, Inc. v. Associated Prods., Inc.*, 880 A.2d 700, 708 (Pa. Super. Ct. 2005)). A conversion is a more serious

deprivation of the owners' rights to their chattel. *Rosemont Taxicab Co. v. Phila. Parking Auth.*, 327 F. Supp. 3d 803, 829 (E.D. Pa 2018). It is defined as "'the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification.'" *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000) (quoting *Underhill Coal Mining Co. v. Hixon*, 652 A.2d 343, 345 (Pa. Super. Ct. 1994)). The exercise of control over the chattel must be intentional, but the tort of conversion does not rest on proof of specific intent to commit a wrong. *Id.* Conversion can be committed in several ways: (1) acquiring possession of the chattel with the intent to assert a right to it that is adverse to the owner; (2) transferring the chattel and thereby depriving the owner of control; (3) unreasonably withholding possession of the chattel from one who has the right to it; or (4) misusing or seriously damaging the chattel in defiance of the owner's rights. *Prudential Ins. Co. of Am. v. Stella*, 994 F. Supp. 318, 323 (E.D. Pa. 1998) (citing *Fort Washington Res., Inc. v. Tannen*, 846 F. Supp. 354, 361 (E.D. Pa. 1994)).

Defendants argue they cannot be liable for trespass to chattels or conversion because Plaintiff admitted in her deposition that she moved out of the apartment and that she voluntarily left personal property in the unit. (Doc. 35, pp. 13-14.) Rather than disposing of the remaining property, Defendants arranged a suitable time for Plaintiff to collect it, yet even then, she left items behind. (*Id.*, p. 14.) They further

contend that Plaintiff failed to sufficiently link Defendants or their agents to any missing or destroyed personal property and to produce adequate evidence of the purported property. (*Id.*, p. 16.) In response, Plaintiff argues that she was dispossessed of the apartment when Defendants changed the locks and directed their agents to move her belongings into another unit that she could not access. (Doc. 39, pp. 16.) She argues that Defendants are therefore responsible for theft and destruction of her property. (Doc. 39, pp. 17.)

Although Plaintiff failed to provide Defendants with evidence to corroborate her claims of destroyed or damaged property, the court is again constrained to find that a genuine dispute of material fact precludes the entry of summary judgment as to Plaintiffs' claims for trespass to chattels and conversion. Under the circumstances of this case, even if Defendants genuinely believed they were justified in taking possession of the apartment, trespass to chattels and conversion do not require specific intent to commit a wrong, only intent to dispossess, and Plaintiff has pointed to sufficient evidence raising a genuine dispute of material fact with respect to these claims.

### E. Civil Conspiracy

Civil conspiracy requires the plaintiff to show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472

(Pa. 1979). An intent to injure, without justification, is "an essential part of a conspiracy cause of action." *Id.*

Here, while Plaintiff has, perhaps, produced sufficient evidence showing that Defendants acted in concert to evict her, she has pointed to nothing in the record supporting an intent to injure as required to establish a civil conspiracy. Summary judgment is thus appropriate on Count IV.

### F. Negligent Hiring

To sustain a claim of negligent hiring under Pennsylvania law, in addition to the elements of common law negligence—that is, duty, breach, causation, and damages—a plaintiff must prove that her injury resulted from (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 488 (3d Cir. 2013) (citing *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 420 (Pa. 1968)); *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 107-08 (Pa. Super. Ct. 1998).

Plaintiff claims that Defendants breached their duty of care towards her when they hired the Hippensteels, who she alleges have extensive criminal records, and allowed them unfettered access to her personal belongings. (Doc. 40, pp. 20.) Defendants argue that they should be granted summary judgment on this claim

because Plaintiff failed to produce any evidence that she was harmed by the Hippensteels, much less that Defendants knew or should have known that the Hippensteels would harm her. Instead, the only evidence Plaintiff points to regarding any potential failure on their part is that a single police officer testified that one of the Hippensteel brothers had been arrested before for an unspecified offense. (*Id.*; *see* Rowe Dep., p. 19.)

The court agrees that this testimony is insufficient to sustain a negligent hiring claim, and therefore Plaintiff has not raised a genuine dispute of material fact as no reasonable jury could find for her based on this sparse factual record. Summary judgement will thus be granted on Count V.

### G. Aiding and Abetting

Defendants next move for summary judgment with respect to Plaintiff's aiding and abetting claim, which is brought against Defendant Gerald Schmid only. The Restatement (Second) of Torts section 876 provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (Am. L. Inst. 1965).

Defendants argue that the undisputed facts show that Gerald did not provide substantial assistance to Violet Schmid in any tortious conduct. (Doc. 35, pp. 22.) In response, Plaintiff argues that Gerald admitted to changing the locks on the apartment, denying her access to her belongings, and committing trespass as well as trespass to chattels. (Doc. 40, pp. 21.) Plaintiff also argues that Gerald provided substantial assistance and encouragement to Violet as part of their common scheme of "[driving] Plaintiff and her minor son out of the apartment . . . ." (Doc. 40, pp. 20.)

The court finds that Plaintiff has raised a genuine dispute of material fact with respect to the aiding and abetting claim. Unlike the civil conspiracy claim, which requires an intent to injure, aiding and abetting only requires a tortious act in concert with another, which Plaintiff has plainly established when viewing all facts in her favor.

### H. Punitive Damages

Finally, Defendants move to preclude Plaintiff's claims for punitive damages. The standard governing the award of punitive damages in Pennsylvania is well-settled: "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) (quoting Restatement (Second) of Torts § 908(2) (1979)); *Chambers v. Montgomery*, 192 A.2d 355, 358 (Pa. 1963).

Punitive damages are "penal in nature" and proper only in cases where the defendant's actions are "so outrageous as to demonstrate willful, wanton, or reckless conduct." *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991); *Feld*, 485 A.2d at 747-48; *Chambers*, 192 A.2d at 358; *See also* Restatement (Second) of Torts § 908, cmt. b. (Am. L. Inst. 1965). A punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted or failed to act in conscious disregard of that risk. *Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005) (citing *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097-98 (Pa. 1985)).

Here, despite zealously painting Defendants' conduct as a "campaign of terror" that "shock[s] the conscience" (Doc. 40, pp. 24), Plaintiff has not pointed to any evidence in the record to support this characterization. Instead, the record reveals an ordinary landlord-tenant dispute lacking the high bar required to permit punitive damages. Accordingly, Plaintiff's claim for punitive damages will be dismissed.

IV.   **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment will be granted in part and denied in part. An appropriate order shall follow.


/s/ Sylvia H. Rambo
Sylvia H. Rambo
United States District Judge

Dated: March 4, 2024